# EXHIBIT 1
# FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SKYHOOK WIRELESS, INC.<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, INC.,<br><br>Defendant. | CIV. A. NO. 1:10-cv-11571-RWZ<br>CIV. A. NO. 1:13-cv-10153-RWZ<br><br>**HIGHLY CONFIDENTIAL –**<br>**ATTORNEYS' EYES ONLY** |

Corrected Expert Report of Jonathan D. Putnam

_[signature]_ 10/31/14

JONATHAN D. PUTNAM          DATE

1

(2)     **TruePosition's Acquisition of Skyhook**

587.    Prof. Magee dismisses the recent acquisition of Skyhook by TruePosition, a subsidiary of Liberty Media.  The acquisition was announced in February 2014, yet Prof. Magee claims the purchase price – $60 million[676] – is irrelevant, despite

---

[676] Contrary to Prof. Magee's claims, there is no evidence that litigation with Google adversely affected the transaction.

244

the fact that a patent purchase is a market transaction.[677] In this case, the acquisition includes all of Skyhook's assets, including patents and data. Prof. Magee claims the TruePosition valuation is not relevant, as it was negatively affected by competition (and alleged infringement) from Google.[678] Despite Prof. Magee's failure to address the factors supporting this extremely rough valuation, he correctly points out that Skyhook's WiFi data has value; therefore the $60 million should be apportioned between Skyhook's various assets.

588. Moreover, the price at which a patent is purchased should reflect the net present value of the future returns the buyer expects to receive, including licensing revenue.[679] Even if one assigns the full price to the value of the patents, Prof. Magee's damages of over $600 million are more than ten times this valuation. Prof. Magee offers no plausible explanation for the significant chasm between the market value and his opinion – yet another indication that his damages request is unsupported and unreasonable.

589. To compare the Skyhook portfolio with industry valuations more generally, I reviewed publicly reported patent portfolio transactions.[680] While the comparison is necessarily imperfect,[681] the purpose is simply to determine whether any

---

[677] Magee Report, ¶¶ 392-394.
[678] See, for example, Magee Report, ¶ 8.
[679] Gregory K. Leonard and Stephen P. Rusek, "Patent Purchase Price Is Useful In Damages Analysis," Law360, September 8, 2014. Last accessed September 30, 3014. http://www.law360.com/ip/articles/573442?nl_pk=0c410a47-6672-46fb-a1e4-f54636bc808a&utm_source=newsletter&utm_medium=email&utm_campaign=ip
[680] R. Laurie, *High-Visibility Patent Sales & IP-Driven M&A Transactions*, presented at 14th Annual Silicon Valley Advanced Patent Law Institute, December 12-13, 2013; IPOfferings, *Patent Value Quotient: Calendar Year 2012*, available at: http://www.ipofferings.com/patent-value-quotient.html.
[681] In principle, one should count the "number of inventions" transacted, which is better approximated by the "number of patent families." This variable was not reported. Moreover, because some applications will

245

interpretation of industry data could accept or reject a claim that Skyhook's inventions are worth "more than average."

590. The reported average payment per patent for telecommunications- and Internet-related technology is about $435,000.[682] The payment per patent in the TruePosition-Skyhook acquisition is $382,000.[683] Even allowing for the approximations inherent to both the Skyhook and industry data, this result is not consistent with the claim that, taken as a whole, Skyhook's technology should be valued substantially different from the average. This conclusion does not change even after construing the data in Skyhook's favor (*e.g.,* a $60 million payment for 60 U.S. patents (only), or $1 million per patent).

591. In contrast, Prof. Magee estimates Google's damages to be greater than $600 million – more than 600 / 8 = 75 times the highest plausible mean value of the asserted patents. As I explain in the Technical Appendix, such valuations are inconsistent with the intrinsic and extrinsic evidence, which does not rank most of the Skyhook patents highly *even within the Skyhook portfolio*.

---

be abandoned, rejected or refilled, there may exist reasonable differences of opinion as to whether applications should be counted, and if so, which. The calculations I report here are made with the acknowledgement that these data issues exist.

Some transactions may have included assets other than patents; I have endeavored, where the information is available, to restrict the analysis to transactions of patent portfolios. In cases where additional assets are present, the payment should be interpreted as an upper bound on the value of the patent portfolio itself.
[682] There are many reasons why the per-patent average may differ between transactions: differences in the underlying quality of the inventions; differences in the economic circumstances of the buyer and/or the seller; differences in the degree to which the patents are encumbered by prior licenses; differences in the remaining life of the patents; etc. Based on these sources, a very conservative average payment per patent is about $435,000, if one does not account for the other assets and items transferred in acquisitions.
[683] This calculation assumes the patents (and patent applications) account for the full value of Skyhook. As I have explained, and as Prof. Magee acknowledges, the AP database accounted for a significant portion of Skyhook's total value.